N.B. v Brody (2025 NY Slip Op 51532(U))

[*1]

N.B. v Brody

2025 NY Slip Op 51532(U)

Decided on September 29, 2025

Supreme Court, Westchester County

Ondrovic, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 29, 2025
Supreme Court, Westchester County

N.B., Plaintiff,

against
Kenneth Brody, HERBERT WINKELMANN by his Estate and Personal Representative ELIZABETH WINKELMANN, and VICTORIA WINKELMANN, Defendants.

Index No. 60777/2021

Meagher & Meagher P.C.
Attorneys for plaintiff
Jasne & Florio, LLP
Attorneys for Defendant Kenneth Brody
Barry McTiernan & Moore
Attorneys for Defendants Herbert Winkelmann
& Victoria Winkelmann

Robert S. Ondrovic, J.

In an action, inter alia, to recover damages for negligence, the defendants Herbert Winkelmann, by his estate and personal representative Elizabeth Winkelmann, and Victoria Winkelmann move pursuant to CPLR § 3212 for summary judgment dismissing the complaint insofar as asserted against them.
The following papers were considered on the motion:
PAPERS       NUMBERED
Notice of Motion, Affirmation, 1 — 12
Exhibits A — H, Statement of Material
Facts, Memorandum of Law
Affirmation in Opposition, Response 13 — 16
to Statement of Material Facts, Exhibits 1 — 2
Memorandum of Law in Reply 17
Relevant Factual and Procedural Background
The plaintiff was sexually abused by the defendant Kenneth Brody between 2010 and 2016, in a home located at 120 6th Street, Verplanck, New York (hereinafter the subject home). The subject home is owned by the defendants Herbert and Victoria Winklemann [FN1]
(hereinafter collectively the defendants), who are Brody's mother-in-law and father-in-law. Brody resided in the subject home with his wife Laura Winkelmann, who is the defendants' daughter (hereinafter Laura), and their four children. Brody is a registered level 2 sex offender, having pleaded guilty in 1992, to first degree sexual abuse of a minor. 
In August 2021, the plaintiff, pursuant to the Child Victims Act, commenced this action against the defendants to recover damages for negligence/gross negligence, and deliberate and reckless indifference.
The defendants' motion
The defendants subsequently moved for summary judgment dismissing the complaint insofar as asserted against them and the plaintiff opposed the motion. In support of their motion, the defendants submitted, among other things, a memorandum of law and their own deposition transcripts and that of the plaintiff.
At his deposition, the plaintiff testified that he became friends with Brody's son, Matthew, when he was in fourth or fifth grade. The plaintiff never met the defendants, but knew they owned the subject home and other apartment buildings in Verplanck. The plaintiff did not know that Brody was a registered sex offender. The plaintiff testified that Brody began sexually abusing him soon after he befriended Matthew. The incidents of abuse happened almost every time the plaintiff was present in the subject home. On certain occasions, Laura and Matthew's siblings were also present, but in a separate part of the subject home. On other occasions, the plaintiff was in the subject home alone with Brody. The abuse also happened at the plaintiff's home and on multiple occasions when the plaintiff accompanied Matthew and Brody to Premier Athletic Club. 
At her deposition, Victoria Winkelmann testified that she does not believe the plaintiff's allegations of sexual abuse against Brody because she never had "any kind of indication that [Brody] was doing anything that was . . . sexual to anybody."[FN2]
Victoria acknowledged that she [*2]has been aware of Brody's status as a registered sex offender since around 1992, when she was informed by Brody's probation officer that he was convicted of a sex offense. Victoria testified that the probation officer did not share any details with her. She stated that when she asked the probation officer "if there was anything that [she] was supposed to do," the officer told her "no."[FN3]

Victoria testified that the defendants own multiple rental properties in Verplanck, including the subject home. She recalled meeting Brody in around 1991, and that Brody and Laura moved into the subject home in around 1992. Brody resided in the subject home from 1992, up until his arrest in April 2017. The defendants did not have a lease agreement with Laura, Brody, or with Laura's business, Hudson Valley Computer Associates, which was operated out of the subject home. Brody and Laura paid approximately $550 per month in rent to the defendants using business checks issued by Hudson Valley Computer Associates.
Victoria stated that prior to 2000, she had a discussion with Laura regarding Brody's conviction of first degree sexual abuse of a minor. Victoria testified that between 1996 - the year Brody and Laura married - and April 2017, she would randomly visit the subject home unannounced. She explained that "[i]t could be as much as three or four times in a week or maybe nothing in a week, or maybe once or maybe twice."[FN4]
Victoria never did a background check on Brody before allowing him to reside at the subject home. She never notified anyone in the community that Brody was a registered sex offender and never took any steps to determine if the community was aware of his conviction. Victoria claimed that when she had the discussion with Brody's probation officer regarding his sex offender status, the tenant of the subject home was Hudson Valley Computer Associates. Victoria did not know the plaintiff and was never present in the subject home at the same time as the plaintiff.
Herbert Winkelmann testified that between 2010 and 2016, he rarely spoke to Brody. According to Herbert, his deteriorated health condition prevented him from traveling, and between 1996 and 2017, he visited the subject home usually unannounced approximately once or twice a year. Herbert learned that Brody was a registered sex offender and had been convicted of sexual abuse of a minor prior to the time Brody became a tenant of the subject home. Herbert never had any discussions with Brody or Laura regarding whether Brody, as a result of his sex offender status, was allowed to interact with children or be within a certain proximity of a school. Herbert never made any attempt to evict Brody and never monitored or supervised the subject home while Brody was a tenant. Herbert testified that he was never present in the subject home at the same time as the plaintiff, and first observed the plaintiff in connection with this matter.
Opposition
In opposition, the plaintiff submitted an affirmation and the deposition testimony of Kenneth Brody and Laura Winkelmann. At his deposition, Brody testified that he met Laura in 1988, met the defendants in 1993, and moved into the subject home that same year. There was no lease in effect during the period Brody resided in the subject home. Brody testified that he [*3]and Laura were not "tenants," but rather, they resided in the defendants' home.[FN5]
Brody testified that in 1995, he told the defendants that he was on probation for pleading guilty to sexual abuse of a minor and was in treatment. Brody was already residing at the subject home when he had that discussion with the defendants. Brody recalled informing the defendants of his status as a level 2 sex offender in early 1996.
Brody testified that the defendants occasionally visited the subject home, but with no regularity. He stated that during the period he resided at the subject home, the defendants visited approximately once or twice a month and stayed for dinner once or twice a year. Brody stated that the plaintiff was in the subject home "[a] couple of dozen [times], tops."[FN6]
Brody was unaware whether the defendants were familiar with the plaintiff prior to his arrest in April 2017.
Laura testified that she cofounded Hudson Valley Computer Associates with Brody in 1994, and rent was paid to the defendants via business check. There was no lease agreement in effect during the period she resided at the subject property. She stated that Brody moved into the subject home in 1993. Laura became aware that Brody had pleaded guilty to first degree sexual abuse of an 8-year old minor several months after the conviction. Brody had been living in the subject home for approximately one month when the defendants learned of his conviction. Laura recalled that Brody "told them what he had done, that he plead guilty and that his probation officer was going to call them and verify that they have been informed."[FN7]
She stated that Brody told the defendants "that he asked the neighbor's nine year old son to touch him inappropriately and he plead guilty to that."[FN8]
It was Laura's understanding that pursuant to the terms of Brody's probation, he could not be alone with a minor under the age of 14 for the duration of his five-year probation. Laura believed that after the probation period ended, Brody was allowed to be alone with a minor 14 years old or younger.
The first time that Laura met the plaintiff was in the fall of 2013. She testified that Brody was never in the subject home alone with the plaintiff. Laura claimed that when Brody was present in the subject home with the plaintiff, all of their children were also present. She stated that the plaintiff accompanied her family to Premier Athletic Club on two occasions. Laura testified that the defendants never directed her to notify the community about Brody's sex offender status. 
ANALYSIS
In support of their motion, the defendants argued that summary dismissal is warranted because they owed no duty to the plaintiff to warn him that Brody was a registered sex offender. The defendants emphasized that they did not undertake a duty to supervise the plaintiff, they never met the plaintiff, were never present in the subject home at the same time as the plaintiff, [*4]and had no control over who visited the subject home. The defendants argued that, in any event, they did not breach any duty owed to the plaintiff because they were not informed of the details regarding Brody's prior conviction and had no reason to take action to protect the plaintiff based on a crime that Brody committed 18 years prior.
In opposition, the plaintiff argued that the defendants did not have a landlord-tenant relationship with Brody and were in the best position to protect against the risk of harm. The plaintiff asserted that the defendants, as members of Brody's family and owners of the subject home, had a duty to control Brody's contact with minor boys on their property. The plaintiff argued that issues of fact exist as to whether the defendants had a reasonable opportunity to control Brody's conduct and whether they were aware for the need of such control given their familial relationship and awareness of his sex offender status and history of sexual abuse of minor boys.
"A plaintiff bringing a negligence action must allege a duty owed to the plaintiff by the defendant, a breach of that duty, and injury proximately resulting therefrom" (Nellenback v Madison County, — NY3d —, — NE3d —, 2025 NY Slip Op 02263 [April 17, 2025] [internal quotation marks omitted]). A critical consideration in determining whether a duty exists is whether "the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm" (Hamilton v Beretta U.S.A. Corp., 96 NY2d 222, 232 [2001]).
"Homeowners have a duty to act in a reasonable manner to prevent harm to those on their property, which includes the duty to control the conduct of third persons on their premises when the homeowners have the opportunity to control such persons and are reasonably aware of the need for such control" (Victor C. v Lazo, 30 AD3d 365, 366 [2d Dept 2006] [internal quotation marks omitted]; see C.M. v SPA 88, LLC, 222 AD3d 436, 437 [1st Dept 2023] [owner of spa had no duty to protect plaintiff from unforeseeable sexual assault by patron pretending to be a masseur]; Maruca v DiGesu, 207 AD3d 713, 714 [2d Dept 2022] [homeowner did not have opportunity to control estranged husband's conduct and was not reasonably aware of need to control him so as to protect plaintiff from unexpected assault]; Chalu v Hariraj, 304 AD2d 515, 516 [2d Dept 2003] [homeowner not reasonably aware of need to control assailants at celebration where plaintiff had a good relationship with the assailants before they assaulted him]; Panzera v Johnny's II, 253 AD2d 864, 865 [2d Dept 1998] [issues of fact whether owner of bar had opportunity to control intoxicated patron and reasonably aware of need for such control and whether shooting was foreseeable]). "[T]he duty to control is commensurate with the authority and opportunity to control" (Torre v Paul A. Burke Const., Inc., 238 AD2d 941 [4th Dept 1997]; see Purdy v Public Adm'r of Westchester County, 72 NY2d 1, 7 [1988] ["we have imposed a duty to control the conduct of others where there is a special relationship: a relationship between defendant and a third person whose actions expose plaintiff to harm such as would require the defendant to attempt to control the third person's conduct; or a relationship between the defendant and plaintiff requiring defendant to protect the plaintiff from the conduct of others"]).
Under the particular circumstances of this case, the defendants' submissions failed to demonstrate, prima facie, that they did not have a reasonable opportunity to control Brody's conduct so as to prevent him from harming the plaintiff and were not reasonably aware of the need for such control. The Court agrees with the defendants that the absence of a lease agreement, coupled with Brody's testimony that he was not a tenant, does not, ipso facto, demonstrate that a landlord-tenant relationship did not exist between the defendants and Brody. [*5]As the defendants correctly point out, the complaint contains numerous allegations referring to Brody as a tenant of the defendants.
Nevertheless, in analyzing the relationship between the defendants and Brody to determine whether the defendants had the opportunity to control Brody's conduct, it cannot simply be characterized as a typical arms-length relationship between landlord and tenant (see Britt v New York City Housing Authority, 3 AD3d 514 [2d Dept 2004] [landlord's power to evict did not furnish it with reasonable opportunity or effective means to prevent tenant from attacking another tenant]). The defendants are members of Brody's family as the parents of his wife. The defendants did not reside at the subject home, which was rented to various family members prior to the home being occupied by Laura in around 1993. The evidence established that Brody moved into the subject home that same year and resided there until his arrest in 2017. The defendants sporadically visited the subject home unannounced during the period that Brody resided in the subject home. Victoria acknowledged that she has been aware of Brody's status as a registered sex offender since around 1992, when she was informed by Brody's probation officer that he was convicted of a sex offense. Laura testified that Brody had been living in the subject home for approximately one month when the defendants learned of his conviction. According to Laura, Brody "told [the defendants] what he had done, that he plead guilty and that his probation officer was going to call them and verify that they have been informed."[FN9]
She stated that Brody told the defendants "that he asked the neighbor's nine year old son to touch him inappropriately and he plead guilty to that."[FN10]
Although Brody believed that the conversation occurred in 1995, he confirmed that he told the defendants that he was on probation "due to sex abuse of a minor."[FN11]
He also told them about his status as a level 2 sex offender in around 1996.
In Lisa I. v Manikas, (188 AD3d 1392 [3d Dept 2020]), which is somewhat analogous though not directly on point, the plaintiff's minor daughter attended a sleepover at the home of her friend's parents when she was allegedly raped by an adult male relative. The Third Department affirmed the denial of the homeowners' motion for summary judgment dismissing the amended complaint, which contained a cause of action alleging premises liability, finding that the homeowners failed to demonstrate, prima facie, that they did not owe a duty to protect the child from the criminal conduct that occurred in their home. In reaching that determination, the Third Department emphasized that the homeowners' submissions established that "they had been notified of prior incidents of alleged sexual misconduct by the relative, and that they were aware of disciplinary actions that had been instituted in response to these prior allegations." (id. at 1394).
Conversely, where an infant plaintiff was sodomized in the basement of the defendants' home by a person they hired to paint the house, summary judgment dismissing the complaint was warranted since the evidence demonstrated that the defendants did not reside at the premises, were not present at the time of the occurrence, and, importantly, were not reasonably aware of the need to control the painter's conduct because they had no knowledge of a prior [*6]incident in which he had sexually abused a minor (see Victor C. v Lazo, 30 AD3d 365, 366 [2d Dept 2006]).
Here, under the circumstances of this case, triable issues of fact exist as to whether the defendants had an opportunity to control Brody's conduct and were reasonably aware of the need for such control giving rise to a duty on their part to prevent harm to the plaintiff. Therefore, that branch of the defendants' motion which was for summary judgment dismissing the cause of action alleging negligence/gross negligence is denied.
However, those branches of the defendants' motion which were for summary judgment dismissing the two separate and distinct causes of action alleging deliberate indifference and reckless indifference are granted. The defendants demonstrated, prima facie, that the cause of action alleging deliberate indifference is not a cognizable theory of liability under the circumstances of this case. In addition, the reckless indifference allegations are duplicative of those asserted in support of the negligence/gross negligence cause of action. In opposition, the plaintiff does not address the merits of those stand-alone causes of action (see Delanerolle v St. Catherine of Sienna Medical Center, 231 AD3d 1013, 1015 [2d Dept 2024]).
Accordingly, it is hereby
ORDERED that the branch of the defendants' motion which was for summary judgment dismissing the cause of action alleging negligence/gross negligence is denied; and it is further,
ORDERED that the branches of the defendants' motion which were for summary judgment dismissing the causes of action alleging deliberate indifference and reckless indifference are granted; and it is further,
ORDERED that all other relief requested and not decided herein is denied.
The foregoing constitutes the Decision and Order of this Court.
Dated: September 29, 2025
White Plains, NY
E N T E R,
HON. ROBERT S. ONDROVIC, J.S.C.

Footnotes

Footnote 1:On March 12, 2025, Elizabeth Winkelmann was appointed as Personal Representative of the Estate of Herbert Winkelmann following his death, and on July 16, 2025, was substituted as a defendant in this action. 

Footnote 2:NYSCEF Doc No 94, p 14

Footnote 3:id. at p 17

Footnote 4:id. at p 44-45

Footnote 5:NYSCEF Doc No 107, p 58

Footnote 6:id at p 119

Footnote 7:NYSCEF Doc No 108 at p 42-43

Footnote 8:id. at 44

Footnote 9:NYSCEF Doc No 108 at p 42-43

Footnote 10:id. at 44

Footnote 11:NYSCEF Doc No 107 at 57-58